## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL NO. 20-CR-00094** |
| | : | |
| v. | : | |
| | : | |
| **JASON DEJOURNETT,** | : | |
| | : | |
| | : | **SENT:  November 10, 2020** |
| **Defendant.** | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorneys, the United States Attorneys for the District of Columbia, hereby submits the following memorandum to assist the Court in issuing an appropriate sentence in this case.  For the reasons set forth herein, the government recommends that the Court sentence the defendant to the low end of the applicable guideline range.  The government further recommends that the Court sentence the defendant to 10 years of supervised release with conditions including that the defendant undergo sex offender treatment (as recommended by the United States Probation Office), the defendant's computer and internet usage be limited and monitored, and the defendant's direct contact with minors be limited and supervised.

### I.    BACKGROUND

On November 10, 2020, the defendant will plead guilty to one count of Access with Intent to View Child Pornography, in violation of 18 U.S.C. § 2252(a)(4).  During the plea hearing, the defendant will admit to the following facts, as set forth in the written Statement of Offense, to be true.

### STATEMENT OF FACTS

#### The Tor Network

Tor  is  a  computer  network  which  anonymizes  Internet  activity  by  routing  a  user's

communications through a global network of relay computers (or proxies), thus effectively masking the internet-protocol ("IP") address of the user.  An "IP address" is a unique numeric address (used by computers on the internet) that is assigned to properly direct internet traffic. A publically visible IP address can allow for the identification of the user and his/her location.

To access the Tor network, a user has to install freely available Tor software, which relays only the IP address of the last relay computer (the "exit node"), as opposed to the user's actual IP address. There is no practical method to trace a user's actual IP address back through those Tor relay computers.

The Tor network makes it possible for a user to operate a special type of website, called "hidden services," which uses a web address that is comprised of a series of 16 algorithm-generated characters (such as "asdlk8fs9dflku7f") followed by the suffix ".onion." Websites, including hidden services, have system administrator(s) (also called the "admin(s)") who are responsible for overseeing and operating these websites.

<u>Bitcoin</u>

Bitcoin ("BTC") is one type of virtual currency that is circulated over the Internet.  BTC is not issued by any government, bank, or company but rather is controlled through computer software.  Generally, BTC is sent and received using a BTC "address," which is like a bank account number and is represented by a case-sensitive string of numbers and letters. Each BTC address is controlled through the use of a unique private key, a cryptographic equivalent of a password. Users can operate multiple BTC addresses at any given time, with the possibility of using a unique BTC address for every transaction.

BTC fluctuates in value. Around March 5, 2018, one BTC was worth approximately $11,573.00.  A typical user purchases BTC from a BTC virtual-currency exchange, which is a business that allows customers to trade virtual currencies for conventional money (*e.g.*, U.S.

dollars, euros, etc.). Little to no personally identifiable information about the sender or recipient is transmitted in a BTC transaction itself. However, virtual currency exchanges are required by U.S. law to collect identifying information of their customers and verify their clients' identities.

To send BTC to another address, the sender transmits a transaction announcement, cryptographically signed with the sender's private key, across the BTC network. Once the sender's transaction announcement is verified, the transaction is added to the blockchain. The blockchain is a decentralized, public ledger that logs every BTC transaction. In some instances, blockchain analysis can reveal whether multiple BTC addresses are controlled by the same individual or entity. For example, analyzing the data underlying BTC transactions allowed for the creation of large databases that grouped BTC transactions into "clusters." This analysis allowed for the identification of BTC addresses that were involved in transacting with the same addresses.

<u>The Website</u>

"The Website" was a website dedicated to the advertisement and distribution of child pornography that operated as a hidden service on the Tor network until March of 2018 when it was seized by law enforcement. The Website was used to host and distribute video files depicting child pornography that could be downloaded by site users. The Website was not intended to be used to upload pornography of adults, as evidenced on the upload page on The Website which clearly stated: "Do not upload adult porn." The Website server had over 250,000 unique video files, which totaled approximately eight terabytes of data.

Any user could create a free account on The Website by creating a username and password. Only after the user registered an account could the user browse previews of videos available for download and post text to The Website. To download videos from the site, users used "points," which were allocated to users by The Website. A registered user could earn points from The Website in several ways: (1) uploading videos depicting child pornography; (2) referring new users

to The Website; (3) paying for a "VIP" account, which lasted for six months, entitled a user to unlimited downloads, and was priced at 0.03 BTC (approximately $327.60 as of March 1, 2018); or (4) paying for points incrementally (*i.e.*, .02 BTC for 230 points).  Points were not transferable to any other website or application. Once a customer sent BTC to The Website, the BTC could not be refunded or redirected. The points obtained by the payment of BTC could only be used for downloading videos.

Certain persons joined the conspiracy to distribute child pornography by uploading videos to The Website.  Those co-conspirators who uploaded videos of child pornography to The Website for "points" also earned additional "points" each time a customer of the site downloaded that particular video from The Website.  Thus, the co-conspirators had a shared goal as part of the conspiracy – increasing the number of unique videos on The Website to drive additional traffic to it, which in turn led to greater downloads and more points for the co-conspirators.  When uploading videos, the co-conspirators would use explicit file names highlighting the content as showing the sexual exploitation of minors and would add tags that customers could search for, such as PTHC, 2yo, etc.  In order to prevent duplicate videos from being uploaded, The Website operated a digital hash-value check of videos the co-conspirators uploaded in order to compare the video to other videos previously uploaded to the site.  The Website did not allow a co-conspirator to upload a video whose hash value matched something previously uploaded to the site.

During the course of the investigation, law enforcement agents in Washington, D.C. accessed The Website on multiple occasions, including on or about September 28, 2017, February 8, 2018, and February 22, 2018, observed its functionality by browsing the listings on The Website, and conducted undercover purchases by downloading child pornography video files from The Website.  These downloaded child pornography video files included pre-pubescent children, infants, and toddlers engaged in sexually explicit conduct.  Each video available for download

from The Website had a title, a description (if added by the co-conspirator), "tags" with further descriptions of the video enabling a user to more easily locate a particular category of video using The Website's search function, and a preview thumbnail image that contained approximately sixteen unique still images from the video.

On or about March 5, 2018, South Korean law enforcement executed a search warrant at the residence of the administrator of The Website in South Korea.  Pursuant to the search, South Korean law enforcement seized The Website's server and associated electronic storage media.  South Korean law enforcement then provided to U.S. law enforcement a forensic image of the server.  U.S. law enforcement subsequently obtained a federal search warrant to review this forensic image.

<u>Defendant's Activities On The Website</u>

Law enforcement's review of the forensic image of the electronic storage devices that had hosted The Website revealed that, between January 8, 2016 and August 13, 2017, the defendant made three payments to The Website from two Subject BTC Exchange Accounts.  The first payment was sent on January 8, 2016 from Subject BTC Exchange Account 1 (ending in E7FQe). This payment was associated with the defendant's username "winkit" on The Website.  In the memo line for the payment, the defendant stated: "please give me unlimited DL."

A month later, on February 6, 2016, the defendant sent a second payment from Subject BTC Exchange Account 2 (ending in uBX1f) to The Website.  In the memo line for the payment, the defendant stated: "I forgot my user pass so signed up again, desinnude Welcome1."

On August 13, 2017, the defendant sent a third payment from Subject BTC Exchange Account 2 to The Website under the same username "desinnude."

Subject BTC Account

Subpoena returns from the virtual currency exchange revealed that the Subject BTC Exchange Account 1 and 2 (which both sent BTC to The Website) were created with the following know-your-customer data:

- registered in the defendant's name with his date of birth;

- using the defendant's address in Seal Beach, California;

- using the defendant's Social Security number, driver's license, phone number, and email.

Sever Data

A review of the forensic image from The Website identified 113 videos downloaded by the defendant using his username "winkit" between January 20, 2016 and January 23, 2016.  The file names and descriptions of these videos are consistent with depictions of child pornography. Specifically, videos downloaded by the defendant include the following:

(1) Video entitled "firsttimeboys- 10yo hairless Dammy show.mp4:" depicting a nude male child, approximately eight to twelve years old, laying on his back with his penis exposed.  The camera zooms in on the child masturbating himself.  This video is two minutes and thirteen seconds in length.

(2) Video entitled "mama_s_synom_v_skaype2.avi:" depicting a nude male child, approximately six to ten years old, laying on a bed with a nude adult female.  The nude adult female uses her hand to masturbate the child's penis.  This video is three minutes and six seconds in length.

The server data also identified that the defendant's username "desinude" downloaded approximately 3.2 gigabytes of data from The Website.  Law enforcement was unable to recover

the file names of the videos downloaded by the defendant with the username "desinude." Note that 3.2 gigabytes is the equivalent of approximately 40 minutes of video content downloaded at standard definition.

Conclusion

The defendant knowingly accessed with intent to view videos of child pornography on The Website, including the videos described above. These videos had been shipped and transported in interstate and foreign commerce and using a means and facility of interstate and foreign commerce, including by computer, and/or were produced using materials that had been shipped and transported in and affecting interstate and foreign commerce, including by computer. The production of these visual depictions involved the use of one or more minors engaging in sexually explicit conduct. The visual depictions of child pornography were of one or more children under the age of eighteen (18) years engaging in such sexually explicit conduct. Specifically:

- One or more images and videos of child pornography accessed by the defendant involved a "prepubescent minor…who had not attained 12 years of age." See U.S.S.G. 2G2.2(b)(2).

- The defendant downloaded 113 videos that depicted child pornography. Accordingly, the offense involved "600 or more images." See U.S.S.G. 2G2.2(b)(7)(D); see also Application Note 4(B)(ii) ("each video…shall be considered to have 75 images.")

## II.   **SENTENCING CALCULATION**

### A.   **Statutory Penalties**

The offense of Access with Intent to View Child Pornography carries a maximum sentence of 20 years of imprisonment pursuant to 18 U.S.C. § 2252(a)(b)(2) if any image involved in the offense involved a prepubescent minor or a minor who had not attained 12 years of age, a fine of not more than $250,000 or twice the pecuniary gain or loss pursuant to 18 U.S.C.

7

§ 3571(d), an order of restitution, and an obligation to pay any applicable interest or penalties on fines or restitution not timely made, and a period of supervised release – after any period of incarceration – of not less than five years or life pursuant to 18 U.S.C. § 3583(k).

### B.      Guidelines Range

The government agrees with the calculation of the defendant's Guidelines sentencing range contained in the pre-sentence report ("PSR").  The base offense level is 22, pursuant to U.S.S.G. § 2G2.2(a)(2).  The government agrees with the PSR that several specific offense characteristics apply:  the material involved prepubescent minors or minors under the age of 12 (+2); the offense involved the use of a computer (+2); and the offense involved more than 600 images (+5).  There are no additional adjustments that apply.  Accordingly, the defendant's adjusted offense level is 27.

The defendant is entitled to a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a).  The government hereby moves to decrease the defendant's offense level by an additional level pursuant to § 3E1.1(b) because he timely notified the authorities of his intention to enter a guilty plea and thus permitted the government and the Court to preserve resources.  As a result, the defendant's total offense level is 24.

The government agrees with the PSR that the defendant has a criminal history score of zero and is in Criminal History Category I.

With an offense level of 24 and a Criminal History Category I, the defendant's Guidelines sentencing range is 51 months to 63 months of incarceration.

### III.      GOVERNMENT'S RECOMMENDATION

### A.      Application of the Federal Sentencing Guidelines

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment

principles articulated in <u>Blakely v. Washington</u>, 124 S. Ct. 2531 (2004).  As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1).  <u>Booker</u>, 125 S. Ct. at 756.

In post-<u>Booker</u> cases, the Supreme Court has stated that a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  <u>See United States v. Gall</u>, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.").  After giving both parties an opportunity to argue for an appropriate sentence, the district court should then consider all of the applicable factors set forth in 18 U.S.C. § 3553(a).  <u>Id.</u>  These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18 U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

Notably, the United States Sentencing Commission conducted a hearing on the child pornography sentencing guidelines on February 15, 2012.  Department of Justice (DOJ) employees James Fottrell and Steve DeBrota, and former DOJ employee Francey Hakes provided the following testimony regarding how technological advances were exacerbating the threats posed by child pornography offenses:

> In the last ten years, we have seen a sharp increase in the severity and depravity of

child pornography offenses, fueled in large part by *swiftly advancing technological changes* which permit offenders to easily store large numbers of images of child sexual abuse, to create safe havens online where they can communicate and bond with other individuals who encourage and promote the sexual exploitation of children, and to utilize sophisticated methods to evade detection by law enforcement. This increase is reflected in the changes in the content of the images over time, as infants and toddlers are now regularly victimized by child pornography offenders and the victims are forced into more brutal and degrading sexual activity.

Additionally, *the technological changes that continue to make it easier for offenders to commit these crimes* are reflected in the number of defendants prosecuted in federal court for child pornography offenses, which has increased every year for over ten years.

We are also seeing the crime change with respect to the *technical complexity and sophistication of the offenders who exploit the developments in both software and hardware*. Storage capacity on hard drives and external media has exploded at the same time that prices for such equipment have dropped, making it feasible for individuals cheaply to store millions of image and video files. Internet speeds have skyrocketed, allowing users to download a video in a matter of seconds that, just a few years ago, would have taken hours. At the same time, smart phones and the development of faster wireless networks have turned phones into a viable and portable alternative method to distribute and collect child pornography. *New platforms are being constantly developed to allow individuals to chat, network, and share files. Child pornography offenders are early adopters of these platforms, co-opting them to further their criminal purpose and to create virtual communities that exist outside the bounds of normal society and that embrace and promote the sexual exploitation of children*. Finally, offenders are *exploiting the development of new technologies*, such as evidence eliminating software, encryption, and methods to conceal their Internet activities, *to evade detection by law enforcement*. The result of these changes is clear: we are seeing more and more offenders, engaged in more sophisticated criminal conduct, exploiting a larger number of children in a more depraved way.

See       https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20120215/Testimony_15_Hakes_DeBrota_Fottrell.pdf (emphasis added).

Moreover, on November 13, 2013, Acting Assistant Attorney General Mythili Raman testified before the Senate Committee on Homeland Security and Governmental Affairs provided the following testimony regarding the unique threat posed by cryptocurrency, including as to child pornography offenses:

As virtual currency has grown, it has attracted illicit users along with legitimate

ones. Our experience has shown that some criminals have exploited virtual currency systems because of the ability of those systems to conduct transfers quickly, securely, and often with a perceived higher level of anonymity than that afforded by traditional financial services. The irreversibility of many virtual currency transactions additionally appeals to a variety of individuals seeking to engage in illicit activity, as does their ability to send funds cross-border.

Cyber criminals were among the first illicit groups to take widespread advantage of virtual currency. We have seen that many players in the cyber underground rely on virtual currency to conduct financial transactions. *Early users of virtual currency also included criminals involved in the trafficking of child pornography*, credit card fraud, identity theft, and high-yield investment schemes. As virtual currency became more widespread and criminals became increasingly computer savvy, other criminal groups moved to capitalize on virtual currency, as well. There are now public examples of virtual currency being used by nearly every type of criminal imaginable.

It is not surprising that criminals are drawn to services that allow users to conduct financial transactions while remaining largely anonymous. And, indeed, *some of the criminal activity occurs through online black markets, many of which operate as Tor hidden services.* Tor hidden services are sites accessible only through Tor, an anonymizing network that masks users' Internet traffic by routing it through a series of volunteer servers, called "nodes," across the globe. *Online black markets capitalize on Tor's anonymizing features to offer a wide selection of illicit goods and services, ranging from pornographic images of children* to dangerous narcotics to stolen credit card information.

See https://www.justice.gov/opa/speech/acting-assistant-attorney-general-mythili-raman-testifies-senate-committee-homeland (emphasis added).

## B.    Basis for the Government's Recommendation

The government submits that a sentence at the low end of the guidelines is appropriate and warranted in this case and specifically recommends a period of supervised release of 10 years based on the factors in 18 U.S.C. § 3553(a).  The recommended sentence is sufficient, but not greater than necessary, to accomplish the purposes of sentencing.

### 1.    Nature and Circumstances of the Offense

The defendant specifically sought out and actively participated in an online safe haven that fostered the mutual encouragement and promotion of the sexual exploitation of children.  In

addition, the defendant laundered funds in a sophisticated manner to support a prolific child pornography website.   Consistent with the Justice Department testimony noted above, the defendant's use of cryptocurrency and technologically-advanced online black markets made tracking his activities exponentially more difficult to discover by law enforcement and demonstrates the growing threat posed by such technology in the child exploitation realm.

It goes without saying that child pornography causes real and lasting harm in our society. It is not just about images and videos; it is about real children who are at best being treated as sexualized objects and at worst being horrifically and repeatedly sexually abused.   Individuals— like the defendant—who promote child pornography offenses are part of the illicit market for child pornography, which continually re-victimizes the children in already-existing images and videos. As the Supreme Court recognized in the seminal case of New York v. Ferber:

> The use of children as subjects of pornographic materials is very harmful to both the children and the society as a whole.   It has been found that sexually exploited children are unable to develop healthy relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults.
>
> Pornography poses an even greater threat to the child victim than does sexual abuse or prostitution.   Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place.

458 U.S. 747, 758-60 nn. 9 & 10 (1982).   The Court continued, "[a] child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography . . . .   It is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotion repercussions."   Id. at 759 n.10.   Victims must cope, every day, with wondering whether someone they have come in contact with has seen the pictures or videos of their abuse.

## 2.      History and Characteristics of the Defendant

In most criminal cases, a defendant will appear for sentencing and offer mitigating evidence, asking the Court to consider the defendant's sometimes less obvious, but positive attributes.   In child-exploitation related crimes, however, a defendant's good qualities are frequently the easiest to see.   Defendants appear to be like any other law-abiding citizen—they work, worship, and have the support of their families.   Their crimes against children, and the reasons they commit them, have been hidden from colleagues, friends, and loved ones.   Despite that fact, the perpetrator's private crime is a horrific one, and offenders must be held accountable for the damage they have done.

Here, however, the defendant has no criminal record.   He indicated an early desire to accept responsibility and plead guilty for his crime.   Notably, prior to being formally charged, the defendant, through defense counsel, reached out to the government requesting an early resolution of this case.   The government has no evidence that the defendant has ever distributed or produced child pornography, has participated in any other illicit sites, or has ever engaged in hands-on abuse of children.   According to the defendant's psychosexual evaluation, he was not designated as a high risk offender and was determined to have a low risk of re-offense.   For these reasons, the government considers a sentence at the low end of the guidelines appropriate.

## 3.      Punishment, Deterrence, Protection, and Correction

A sentencing court "shall impose a sentenced sufficient, but not greater than necessary" to comply with the need for a sentence: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."   18 U.S.C. § 3553(a)(2).

The government's recommended sentence is sufficient, but not greater than necessary, to provide just punishment for the defendant's offenses.  The defendant's possession and distribution of child pornography videos and resulting promotion of a child exploitation scheme harmed society at large and specifically, child victims, and thus warrants a sentence of imprisonment.  Moreover, a term of supervised release with conditions including sex offender assessment and treatment is important to ensuring that the defendant receives the continuing treatment and support that will ensure he does not commit any additional crimes in the future.

### 4.    Available Sentences And Supervised Release Conditions

The defendant should be sentenced to a term of incarceration.  The defendant is in Zone D of the Guidelines, and thus a probationary sentence would be a departure from the Guidelines.

In addition, the Court should impose a term of supervised release, and the government recommends a term of 10 years.  Supervised release is critical because it will subject the defendant to ongoing monitoring and ensure that he does not revert back to his criminal conduct when he finds himself facing a life challenge or obstacle.

The conditions of supervised release should include the following conditions, which are conditions imposed in similar child exploitation cases and conditions:

(1)    The defendant must submit to searches of his person, property, house, residence, vehicle, papers, computers, other electronic communications or data storage devices or media, and effects, at any time, with or without a warrant, by law enforcement or probation officer with reasonable suspicion concerning unlawful conduct or a violation of a condition of supervision.

(2)    The defendant must undergo and comply with sex offender evaluation and treatment.  This may include the use of polygraph testing as part of the therapeutic process.

14

(3)     The defendant's use of the Internet, computers, and any other Internet-capable devices will be restricted and monitored.

(4)     The defendant will not have direct contact with minors without the written approval of probation.   This also entails both an employment/volunteer restriction and residential restriction, in that the defendant shall not be employed in any capacity, or participate in any volunteer activity, which may cause him to come in direct and/or unsupervised contact with children for more than momentary duration without advanced approval by the United States Probation Office, and the defendant shall have all residences pre-approved by the United States Probation Office. Specifically, the defendant shall not live in a residence where minor children also reside without the permission of the United States Probation Office.

As it relates to the above conditions, first, the defendant will be required by statute to register as a sex offender as a result of his conviction in this case.  Second, the defendant's crimes stem from his online communications.  Thus, the defendant's use of the Internet to commit his crimes justifies monitoring his future use.  Third, the defendant's collection of child pornography material justifies monitoring his direct contact with any minors and supports the imposition of sex offender evaluation and continued sex offender treatment.

### 5.     Avoiding Unwarranted Sentencing Disparity

One of the statutory factors to consider at sentencing is the need to avoid unwarranted disparity.  Indeed, avoiding such uncertainty and disparity was one of the purposes for the creation of the Sentencing Guidelines.  Thus far in the United States District Court for the District of Columbia, only two users of The Website have been sentenced.  One pled guilty to Money Laundering (due to evidentiary issues associated with that specific case) and he was sentenced to 18 months incarceration, and the other pled guilty to Receipt of Child Pornography (second

offense) and was sentenced to the mandatory 15 years incarceration.  Accordingly, these two cases are not similarly situated to the defendant's instant case.

However, defendant Darryl Miller was initially charged in the District Court for the District of Columbia with one count of Access with Intent to View Child Pornography based on ten payments he made to The Website between September 2016 and May 2017.  Miller purchased VIP status, which allowed him to download approximately 20 gigabytes of data from The Website.  In addition, Miller's BTC account sent Bitcoin to two other darknet marketplaces: AlphaBay and Hansa Market.   A subsequent search of Miller's electronic devices identified approximately 57 child pornography images that were located in the unallocated space on the device.  These images included depictions of infants, toddlers, and prepubescent children engaged in sexually explicit conduct.

Miller's case was transferred to the District of Kansas (where he resided) for imposition of Miller's plea and sentencing.  Miller similarly pled guilty to one count of Access with Intent to View Child Pornography.   On September 15, 2020, Miller was sentenced to 60 months incarceration.  Miller's offense level was 28[1] and he had a Criminal History Category I.  Miller's resulting Guidelines sentencing range was between 78 months to 97 months of incarceration.  According to the Assistant U.S. Attorney who handled Miller's sentencing, the Court's sentence of 60 months incarceration was an 18 month downward variance that was based, in part, on Miller's prior combat military experience.[2]

---

[1]  Miller received an extra four point enhancement under the Sentencing Guidelines due to his possession of child pornographic depictions of infant and toddler.

[2]  The Government reached out to other prosecutors throughout the United States for sentencing information on similarly situated defendants.  The Government did not learn of any defendants who were similarly situated to the instant defendant for purposes of sentencing.  Unlike the defendant and Miller above, other defendants involved in The Website were sentenced, not for their download activity on The Website, but for evidence recovered from subsequent search

### 6.   Restitution and Victim Impact Statements for the Victims

The National Center for Missing and Exploited Children identified four victims in the defendant's downloaded child pornography videos.  These victims were part of the following series: (1) Bianca, (2) Lucy, (3) cooldaddy, and (4) v_school.  At this time, the identified victims have neither requested restitution nor have a victim impact statement to submit.

## IV.   <u>CONCLUSION</u>

WHEREFORE, based on the facts of this case, the information contained in the Presentence Investigation Report, and the foregoing, the government recommends that the Court sentence the defendant to a term of imprisonment at the low end of the applicable guideline range, to be followed by 10 years of supervised release, with the standard and recommended conditions of supervision.

Respectfully submitted,

MICHAEL SHERWIN
United States Attorney
District of Columbia

By:      */s/ Lindsay Jill Suttenberg*
_____
LINDSAY JILL SUTTENBERG
Assistant United States Attorney

---

warrants on their electronic devices.  For example, Eliseo Arteaga Jr., pled to Possession of Child Pornography in the Northern District of Texas and was sentenced to 75 months.  His guideline range was 78-97 months.   While he downloaded 18 videos from The Website, considerably less than the defendant here, a subsequent search warrant of Arteaga's electronic devices identified almost 2,000 images and 50 videos that depicted child pornography.  According to the Assistant U.S. Attorney in Texas, Arteaga was sentenced for his expansive collection of child pornography that he possessed on his devices.  Similarly, the District of Massachusetts also sentenced two users of The Website, Eryk Chamberlin and Al Ramadhanu Soedomo.  Both defendants pled guilty to Possession of Child Pornography and were sentenced to 12 months and one day.  According to the prosecutor who handled both cases, there were no specific download history from The Website that was associated with either defendant.  Accordingly, their charges were based on subsequent search warrants, admissions, and the evidence that was discovered during the forensic reviews of their electronic devices.